UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RICHARD J. TRITZ,

    Plaintiff,

    v.                                                  Case No. 10-C-450

MICHAEL ASTRUE, Commissioner,

    Defendant.

**DECISION AND ORDER**

**I. NATURE OF THE CASE**

On May 24, 2010, Richard Tritz ("Tritz") commenced this action, seeking judicial review of the Commissioner's final decision denying him benefits pursuant to 42 U.S.C. § 405(g). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

**II. PROCEDURAL HISTORY**

Tritz filed his application for Disability Insurance Benefits ("DIB") on August 18, 2006, alleging disability as of August 2, 2004, due to a back impairment and resulting pain. (Tr. 51–52, 97–99.) Tritz's date last insured for DIB purposes was June 30, 2007. (Tr. 13.) The Social Security Administration ("SSA") denied his application initially on January 8, 2007, and then again upon reconsideration on May 10, 2007. (Tr. 11.)

The SSA held a hearing on July 14, 2009, to determine his disability status. (Tr. 18.) On August 13, 2009, Administrative Law Judge ("ALJ") Wayne L. Ritter issued a decision finding that Tritz "was

not under a disability . . . at any time from August 2, 2004, the alleged onset date, through June 20, 2007, the date last insured." (Tr. 17.) Tritz sought review of the decision by the Appeals Council and the Appeals Council denied his request for review. (Tr. 1.) He now seeks judicial review of the Commissioner's final decision to deny benefits pursuant to 42 U.S.C. § 405(g).

## III. BACKGROUND

This section includes a short summary of (1) Tritz's testimony; (2) Mary Jo Nietupski's ("Nietupski") testimony; (3) Tritz's medical record; (4) the testimony of the Vocational Expert ("VE"); and (5) the ALJ's decision.

### A. Tritz's Testimony

Tritz's testimony began with a discussion of his back surgery in 2001, which initially alleviated his back pain until 2004. (Tr. 24.) He discussed additional surgery with two doctors, but both advised against the surgery as unlikely to reduce his symptoms. (Tr. 24–25.) He did receive epidural shots on multiple occasions in 2005 in an attempt to reduce his back pain. (Tr. 25.) However, the shots "were causing more grief than they were [fixing] things," so he discontinued the epidural shots. (Tr. 25.)

Tritz's last full-time position was in 2001 as a senior consultant for a computer software consulting company. (Tr. 29.) After that time he held only part-time positions, such as selling merchandise at the Bradley Center. (Tr. 30.) He has been unemployed since 2004 when he was fired from the Bradley Center position due to his inability to work "a six hour assignment." (Tr. 31.)

Tritz has taken several medications to help with back pain and depression. (Tr. 25–26.) He noted that if the pain medication was strong enough to relieve pain, it usually "knock[ed him] out" or he would "feel goofy afterwards." (Tr. 34.) However, if he took a more mild form of pain medication, he could stay awake, but it would not relieve the pain. (Tr. 26.) Instead, Tritz tried to manage his pain by

controlling his activities and by getting rest when he received signals that his back pain would begin. (Tr. 34.) He stated that his hip would start to hurt, which was basically an "alarm that goes off that tells [him] that [his] back pain is going to start soon." (Tr. 34.) If he does not stop his activity and lie down immediately upon receiving this "alarm," then the back pain will remain for days instead of hours. (Tr. 35.)

With regard to back pain, Tritz usually experiences a "major episode" every eight months or so, which will last approximately two months in duration. (Tr. 36–37.) During a "major episode," Tritz states that he is completely unable to work, even at the "world's easiest job." (Tr. 36.) A minor episode "might last two or three days to perhaps a week, or it could last perhaps as short as a day or two." (Tr. 37.)

The ALJ questioned Tritz about his depression. (Tr. 31.) Tritz stated that he had been taking dual medications for pain and depression and he participated in counseling during the early 1990s. (Tr. 32.) He has also seen marriage counselors with his wife. (Tr. 32.) He did not participate in individual psychosocial or psychiatric counseling for depression, anxiety, or any other related mental health issues in the five to six years preceding the hearing. (Tr. 32.)

### B. Nietupski's Testimony

Tritz's wife, Nietupski, also testified regarding Tritz's impairments. Nietupski stated that Tritz's back pain has taken over his life. (Tr. 39.) Before committing to any social engagement, Tritz must first consult his back to determine whether or not he will be in pain. (Tr. 39.) As a result, Tritz has missed many important family occasions, such as his daughter's graduations and family trips. (Tr. 40–41.) This has put a tremendous strain on their marriage and they had begun seeing a marriage counselor. (Tr. 38.)

3

Nietupski stated that Tritz is able to walk a of couple blocks before needing to stop and go back home. (Tr. 41.) He also helps with small household chores such as occasionally making meals and taking the garbage out. (Tr. 41.) However, Nietupski bears the majority of the household burden because Tritz is unable to take care of tasks such as cleaning, mowing the lawn, and shoveling snow. (Tr. 41.)

In Nietupski's opinion, Tritz is unable to sustain a regular job, but he may be capable of performing some form of computer work from home. (Tr. 42.) She stated that "[t]he longest [she's] seen him sit is probably an hour-and-a-half, and then he has to get up and either walk around or lie down." (Tr. 42.)

### C. Tritz's Medical Record

In 1986, Tritz developed low back pain, which led to back surgery in 2001. (Tr. 362.) The surgery greatly reduced Tritz's back pain. (Tr. 362.) In 2003 and 2004, magnetic resonance imaging of the lumbar spine revealed two small disc bulges and an annular tear. (Tr. 327.) Around September 2004 Tritz's low back pain returned and has remained constant since December 2004. (Tr. 362.)

On January 5, 2007, Dr. Robert Callear completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 372–79.) He stated that Tritz is capable of lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and is unlimited in his ability to push and/or pull. (Tr. 373.) With regard to postural limitations, Dr. Callear only restricted Tritz's ability to stoop and crouch to occasionally instead of frequently. (Tr. 374.) Dr. Callear found no further physical limitations caused by Tritz's impairments. (Tr. 375–79.)

On May 9, 2007, Dr. Syd Foster concurred with Dr. Callear's opinion. (Tr. 441.) The extent of Dr. Foster's one-page opinion is as follows: "[u]pon review of the evidence the Physical Residual

Functional Capacity Assessment of 1/5/07 is affirmed as written." (Tr. 441.)

On January 8, 2007, Dr. Keith Bauer completed a psychiatric review of Tritz, which assessed his mental health from August 20, 2004 to January 4, 2007. (Tr. 399.) Dr. Bauer evaluated Tritz's condition under Listing 12.04, Affective Disorders, but found that he only suffered from two of the necessary four symptoms of depressive syndrome. (Tr. 402.) Specifically, Dr. Bauer noted that Tritz suffered from sleep disturbance and decreased energy. (Tr. 402.) Based on his assessment, Dr. Bauer found Tritz mildly restricted in his ability to perform activities of daily living and to maintain concentration, persistence, or pace. (Tr. 409.) Dr. Bauer did not note any limitations in Tritz's ability to maintain social functioning. (Tr. 409.) Ultimately, Dr. Bauer opined that the evidence of Tritz's condition did not establish the presence of the "C" criteria of the Listings and therefore found that Tritz does not suffer from an Affective Disorder. (Tr. 410.)

On May 10, 2007, Dr. Michael Mandli concurred with Dr. Bauer's opinion. (Tr. 442.) The extent of Dr. Mandli's one-page opinion is as follows: "[u]pon review of the evidence the Psychiatric Review Technique assessment of 1/8/07 is affirmed as written." (Tr. 442.)

Dr. Kathleen Baugrud became Tritz's primary care physician in the early 1990s. (Tr. 121–22.) As Tritz's primary care physician, Dr. Baugrud manages all of Tritz's physical and mental conditions. (Tr. 121–22.) Her treatment involves medication, tests, and physical therapy, and she referred Tritz to specialists when necessary. (Tr. 121–22.)

On July 10, 2009, Dr. Baugrud wrote a letter on behalf of Tritz discussing her impressions of Tritz's impairments. (Tr. 493.) She stated that for at least ten of the last fifteen years, Tritz had been suffering from chronic back pain caused by degenerative disc disease, an annular tear, and severe disc desiccation. (Tr. 493.) Dr. Baugrud limited Tritz's lifting ability to not more ten pounds and prohibited

5

him from twisting, stooping, squatting, and climbing stairs or ladders. (Tr. 494.) She stated that as a result of the back pain, Tritz "has significant problems with depression, attention, concentration, focus, [and] ability to follow through on tasks." (Tr. 495.) She also noted that he struggles with insomnia and lack of interest in activities. (Tr. 493–94.)

Dr. Baugrud recounted the medications and treatments Tritz had undergone to combat pain and depression. (Tr. 494.) She stated that "[o]ver the course of the 10 years, he has been treated with maintenance daily medications including: Gabapentin or Lyrica, Tramadol, Cyclobenzaprine (and other muscle relaxers), Clonazepam, Buspirone, Cymbalta (and other anti-depressants), Zolpidem and multiple Nonsteridal anti-inflammatory medications." (Tr. 494.) Despite "constant use" of the medications, Tritz's pain has not been eliminated, nor has his pain been significantly reduced. (Tr. 494.) She also stated that Tritz participated in regular physical therapy and visited a chiropractor, but did not have significant reductions in his back pain. (Tr. 494.)

Dr. Baugrud provided her opinion of Tritz's abilities:

> As a consequence of his chronic pain, he is disabled in that he cannot walk any length of time or stand any period of time without pain. He has baseline pain at rest. If he is required to sit for any period of time, he will develop intolerable pain within 30 minutes. If he is required to stand, he will get intolerable pain within 15 minutes. When his pain becomes incapacitating, it requires him to interrupt his activities, lie down and rest. This period of rest needs to last approximately 30 minutes or longer, at which time the pain will subside enough that it gets him back to his baseline level of pain. Shifting positions, moving from a standing position or a sitting position to another position will sometimes improve the pain, but will not eliminate the exacerbation of pain. Unscheduled breaks are necessary on an as needed as well as scheduled basis to prevent pain from becoming intolerable.
>
> He is prohibited from lifting any more than 10 pounds. He is prohibited from twisting, stooping, squatting, climbing stairs or climbing ladders. Standard stair climbing can be done rarely, but must need to be done slowly and he must be allowed to take breaks. He has no disability in his upper hands and upper body with exception of any activity which might cause a flare in his lower back.

6

(Tr. 494.)

She further reported that when Tritz has a "flare" of back pain, he could be completely incapacitated for days or weeks and that "flares" are often triggered by "mundane physical activities such as lifting, bending or yard work." (Tr. 494.) Because of the pain, "[Tritz] would lose multiple days, at least 4 to 5 days or more per month and more if he experienced a severe flare." (Tr. 495.)

### D. Vocational Expert's Testimony

Spencer L. Moseley ("Moseley") testified at the hearing as a vocational expert ("VE"). Based on the information received during Tritz's testimony and Moseley's review of the record, Moseley determined that Tritz's past work as an application programmer-analyst is skilled work with a light exertion level. (Tr. 25.) Additionally, he found that Tritz's work as a computer software consultant is skilled work with a sedentary exertion level as listed in the DOT code, but heavy work based on Tritz's description of the job. (Tr. 26.)

The ALJ then asked Moseley whether any jobs exist for a person of Tritz's "age, education, and work experience . . . who is able to perform light work as defined by the regulations" but "is further limited to only frequent climbing of ramps, stairs, ladders, ropes, or scaffolds, frequent balancing, occasional stooping or crouching, and frequent kneeling or crawling." (Tr. 26.) Searles answered that the hypothetical person could perform Tritz's past work as it is defined by the DOT. (Tr. 26–27.) The ALJ then asked whether Tritz's former positions would be available to the same hypothetical person but also "adding that the person must be allowed to sit or stand alternatively at will provided they are not off task more than 10 percent of the work period." (Tr. 27.) Moseley felt that both past work positions would be available to the hypothetical person. (Tr. 27–28.) Moseley also testified that the hypothetical person could also perform the necessary tasks of a mail clerk, a cashier, and a blood unit assistant, which

7

amount to approximately 125,000 positions in Wisconsin. (Tr. 28.) If the hypothetical person would be absent for more than one day per month or required more breaks during the day than are customarily available, all jobs would be precluded. (Tr. 29.)

### E. ALJ's Decision

The ALJ must follow the required five-step sequential evaluation to determine a claimant's disability status. 20 C.F.R. § 416.920. At the first step, the ALJ must determine if the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I). If so, the claimant is not disabled. *Id*. Here, Tritz did not engage in substantial gainful activity from August 2, 2004, which was the alleged onset date, through his date last insured, so the ALJ moved forward to step two. (Tr. 13.)

Under step two, the ALJ determines whether an impairment is "severe," which means that the impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.920(a)(4)(ii); *see also* 20 C.F.R. § 416.921. Here, the ALJ determined that Tritz suffered from the severe impairment of degenerative disc disease of the lumbar spine. (Tr. 13.) He found that the degenerative disc disease caused more than minimal limitations in Tritz's ability to perform work related activities. (Tr. 13.) The ALJ also noted that Tritz was diagnosed with depression during the relevant period, but found that depression did not cause more than a minimal limitation in Tritz's ability to perform work related activities, and is therefore "nonsevere." (Tr. 13.)

In evaluating a claimant's impairments under step three, an ALJ must determine if the severe impairments listed in step two meet or equal the requirements of any listed section or any part of the List of Impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 416.920(a)(4)(iii). Here, the ALJ found that Tritz's lumbar spine impairment did not meet or equal the impairments found in the Listings. (Tr. 14.) Tritz did not qualify as "disabled" under step three, so the

8

ALJ continued his analysis to step four. (Tr. 14.)

At step four, the ALJ must determine whether the claimant has the capacity to return to his previous work. 20 C.F.R. § 416.920(a)(4)(iv). During the hearing, the ALJ presented the VE with a hypothetical person with Tritz's age, education, work experience, and RFC. (Tr. 973–94.) The VE then testified at the hearing that this hypothetical person could perform Tritz's past relevant work as an applications programmer-analyst and a computer software consultant. (Tr. 16–17.) Based on the VE's tesimony, the ALJ found Tritz capable of performing his past relevant work and was therefore not disabled "at any time from August 2, 2004, the alleged onset date, through June 30, 2007, the date last insured." (Tr. 17.) Because the ALJ found that Tritz was not disabled at step four, the analysis ended before addressing Tritz's condition under step five.

## IV. STANDARD OF REVIEW

Review of the Commissioner's decision is limited. The Social Security Act states that "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Reversal is warranted only if the Commissioner's findings lack support by substantial evidence or if the Commissioner applied an erroneous legal standard. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The court's review is confined to the rationale provided in the ALJ's decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where conflicting evidence allows reasonable minds to differ in determining whether the claimant is entitled to benefits, the responsibility for that decision

rests with the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). In reviewing the Commissioner's decision for a substantial evidence determination, a court reviews the entire administrative record, but may not reweigh the evidence, decide the facts anew, resolve conflicts or substitute its own judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Commissioner need not provide a written evaluation of each piece of evidence, however, a "minimum articulation" of evidentiary findings is necessary. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987).

## V. DISCUSSION

Tritz asserts that the ALJ (1) did not give the proper weight to his treating physician's opinion; (2) improperly discredited Tritz's testimony regarding his impairments; (3) inaccurately determined Tritz's RFC; (4) erroneously found Tritz's depression to be non-severe; and (5) erroneously relied on unauthenticated documents. The court addresses each argument below.

### A. Dr. Baugrud's Opinion

Generally, the ALJ gives more weight to opinions from a claimant's treating physician because the physician has a greater familiarity with the claimant's conditions and circumstances over a period of time. 20 C.F.R. § 404.1527(d)(2). If a treating physician's opinion on "the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." SSR 96-8p, 1996 WL 374184 (July 2, 1996); *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference and the ALJ must weigh the opinion using several factors including the length, nature, and extent of the

claimant's relationship with the treating physician; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. 20 C.F.R. § 404.1527(d); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). The ALJ must give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306.

Tritz argues that the ALJ improperly discounted the opinion of his treating physician, Dr. Baugrud. Reviewing the ALJ's decision in light of the record presented, the court agrees.

The ALJ stated the following in his decision:

> The claimant's primary care physician, Kathleen Baugrud, M.D., rendered a functional assessment on July 10, 2009 which differs significantly from that of Drs. Callear and Foster (Exhibit 23F). Dr. Baugrud concluded that the claimant cannot walk or sit for any length of time without experiencing intolerable pain, and cannot lift more than ten pounds (*Id*. at 2). However, the limitations which Dr. Baugrud lists are contradicted by the claimant's own admissions (that he can sit continuously for up to three hours) and other doctors' recommendation (that he can lift up to *twenty* pounds). Furthermore, the undersigned notes that the assessment was rendered two years *after* the claimant's date last insured (June 30, 2007), and is not a reliably accurate description of the claimant's limitations during the period relevant to this decision. Accordingly, the undersigned does not find Dr. Baugrud's opinion to be of great weight.

(Tr. 16.)

With regard to Dr. Baugrud's opinion, the ALJ noted that the functional assessment differed from the assessments provided by Drs. Callear and Foster. Drs. Callear and Foster limited Tritz to lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. Additionally, they restricted Tritz's ability to stoop and crouch to occasionally instead of frequently.

11

In contrast, Dr. Baugrud found that Tritz cannot lift more than ten pounds, walk for any length of time without pain, stand for more than fifteen minutes, or sit for more than thirty minutes. She also stated that he cannot twist, stoop, squat, or climb stairs and ladders.

These opinions are clearly inconsistent. However, the ALJ must demonstrate not merely that the opinions are inconsistent, but must show that the treating physician's opinion is inconsistent with "other substantial evidence." Citing two RFC Assessments, both of which lack any explanation, is insufficient to strip Dr. Baugrud's opinion of controlling weight.

As further support for denying Dr. Baugrud's opinion controlling weight, the ALJ states that Tritz's admissions contradict Dr. Baugrud's opinion. First, the ALJ claims that Tritz admitted to being capable of sitting for up to three hours. Looking to the record, on November 17, 2006, Tritz stated in a Physical Activities Questionnaire that he can sit up to three hours when using a special chair. (Tr. 149.) He further stated that in most chairs, he can sit for only ten to fifteen minutes. (Tr. 149.) Dr. Baugrud's opinion regarding Tritz's ability to sit is fifteen minutes longer than Tritz claims. This is not a significant amount of time to cause a finding of inconsistency. This is especially true when viewed in light of the ALJ's determination that Tritz is capable of sitting for six hours during an eight-hour workday.

The ALJ also misconstrues Tritz's statement that a doctor told him not to lift more than twenty pounds as an admission that Tritz is capable of lifting up to twenty pounds. Upon review of the hearing transcript, Tritz does not admit to lifting this weight, he only mentions that an unnamed doctor limited his lifting to not more than twenty pounds. (Tr. 35.) Dr. Baugrud's opinion is therefore not inconsistent with Tritz's testimony.

Even if the ALJ had supported his decision to not grant controlling weight to Dr. Baugrud's opinion, he failed to demonstrate that he used the factors listed above in determining what lesser weight

12

to assign Dr. Baugrud's opinion. He does not mention that Dr. Baugrud was Tritz's primary care physician for approximately fifteen years, which includes the time period relevant to the disability determination. Nor does he discuss that Dr. Baugrud treated Tritz on a regular basis during those fifteen years.

Finally, the ALJ states that Dr. Baugrud's opinion cannot be relied on as accurate because the opinion was rendered two years after Tritz's date last insured. "A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). The ALJ does not address whether the opinion is corroborated by evidence during the eligible period before discounting the opinion as irrelevant due to the two year discrepancy. Upon review of the record, contemporaneous evidence consistent with Dr. Baugrud's opinion does exist. (*See*, *e.g.*, Tr. 319, 332–43, 356, 361, 367.) The ALJ therefore erred by dismissing Dr. Baugrud's opinion as an uncorroborated retrospective diagnosis before conducting the appropriate inquiry.

Based on the discussion above, the case will be remanded to allow the ALJ to assign the appropriate weight Dr. Baugrud's opinion.

### B. Adverse Credibility Finding

Tritz argues that the ALJ erroneously found that Tritz's is not credible. He further argues that by discounting Tritz's statements about pain, the ALJ failed "to consider the relationship between his impairment and his pain." (Pl.'s Br. 15.)[1]

When a claimant testifies regarding symptoms from his impairment, the ALJ must evaluate the credibility of the claimant's testimony. 20 C.F.R. § 404.1229(c)(3). A credibility finding is entitled to

---

[1] The Commissioner failed to address this argument in his response.

deference and will only be disturbed if "patently wrong" in light of the record. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Despite this deferential standard, "the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record, *Villano* [*v. Astrue*], 556 F.3d [558, 562 (7th Cir. 2009)]." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Once a claimant establishes, by medical signs and laboratory findings, that a physical or mental impairment could be expected to produce pain, the decisionmaker must evaluate the claimant's credibility and the extent that the claimant's alleged pain or other nonexertional limitations may affect his ability to work. *Glomski v. Massanari*, 172 F. Supp. 2d 1079, 1083 (7th Cir. 2001). When evaluating a claimant's credibility, the ALJ must look to the entire case record and give specific reasons for the weight given to the claimant's statements. SSR 96-7p, 1996 WL 374186 (July 2, 1996). To do this, the ALJ considers the following factors: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for fifteen or twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). *See also Glomski*, 172 F. Supp. 2d at 1083–84 (listing the seven factors a decisionmaker must consider when evaluating the claimant's credibility with regard to pain or other nonexertional limitations).

The ALJ made the following statement in his decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause symptoms of the types alleged; however, the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 15.)

As stated in Tritz's Notice of Citation of Supplemental Authority, the Seventh Circuit specifically rejected boilerplate credibility determinations like the one recited above. *See Martinez v. Astrue*, 630 F.3d 693, 696–98 (7th Cir. 2011). In *Martinez*, the ALJ began his credibility determination by stating that "the claimant's medically determinable impairments could reasonably be expected to produce some symptoms, but . . . the claimant's statements concerning the intensity, persistence and limiting effects of theses symptoms are not entirely credible." *Id*. at 696. The court stated that the ALJ's recital concerning the claimant's credibility was perfunctory and that such an empty explanation of the ALJ's credibility determination is unsatisfactory. *Id*. Instead, an ALJ must "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it." *Id*. at 697.

Contrary to Tritz's assertion, the ALJ does provide specific reasons for discounting Tritz's testimony. Specifically, the ALJ states that Tritz's complaints of pain are contradicted by the Physical RFC Assessments provided by Drs. Callear and Foster and by statements made by Tritz's family.[2] However, Tritz's statements are consistent with the RFC Assessment offered by Dr. Baugrud. Because

---

[2] Several of Tritz's family members wrote letters in support of Tritz's complaints of pain and restricted mobility. (Tr. 186–94.) Although the ALJ cites these letters as inconsistent with Tritz's claims, the court finds that the letters are almost entirely consistent. The only possible inconsistency is a statement made by Nietupski that "[t]he extent of his pain tolerance is seen when he goes to visit my aunt in assisted living. If he does this, he cannot do anything else. My aunt lives about 15 minutes from our house. His visits last about 1 ½ hours. The extent of his physical activity while visiting my aunt is sitting and talking." (Tr. 189–90.) Even assuming that this is actually contradictory to Tritz's statements, which the court is not presently convinced of, reliance on only this statement would be insufficient, in light of the record, to find Tritz incredible.

15

the weight assigned to Dr. Baugrud's opinion influences the ALJ's determination of whether Tritz's statements are consistent with the record, and therefore credible, I will remand the issue of Tritz's credibility to the ALJ. Once the ALJ has determined the appropriate weight to give to Tritz's treating physician, he should then determine whether Tritz's statements continue to lack credibility.

### C. Residual Functional Capacity Assessment

A claimant's RFC refers to what "an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184 (July 2, 1996). If a claimant has a severe physical or mental impairment, but that impairment does not meet or equal an impairment in the Listings, the ALJ will consider the impact of that impairment and any related symptoms, including pain, in the claimant's RFC. 20 C.F.R. § 404.1529(d)(4). An ALJ is required to evaluate a claimant's subjective complaints of pain when determining whether the claimant is disabled. 20 C.F.R. § 404.1529. In determining what symptoms should be included in a claimant's RFC, the ALJ will consider objective medical evidence, as well as descriptions and observations of limitations provided by the claimant. 20 C.F.R. § 404.1529(b)–(c).

Tritz alleges that the ALJ did not adequately determine Tritz's RFC as it relates to "time off-task." Specifically, Tritz argues that the ALJ provided an inaccurate hypothetical to the VE, which resulted in the VE determining that Tritz could perform prior work. (Pl.'s Br. 10–11.)

The court will not specifically evaluate the merits of this argument. Because the ALJ did not properly address Dr. Baugrud's opinion, the resulting hypothetical offered to the VE may have been inaccurate. The court will therefore direct the ALJ to present an accurate hypothetical consistent with this opinion and consistent with the weight the ALJ ultimately assigns to Dr. Baugrud's opinion after reconsideration.

16

**D. Depression**

Tritz argues that the ALJ erroneously found Tritz's depression to be non-severe during the relevant time period. Tritz references the record, specifically Dr. Baugrud's opinion that he was "in a 'vicious cycle' of pain, depression, and disability." (Pl.'s Br. 8.)

Like the two subsections before this, the ALJ's determination regarding Tritz's depression hinges on the weight assigned to Dr. Baugrud's opinion. In that opinion, Dr. Baugrud stated that Tritz "suffers from severe depression," which "manifests as sad mood, impaired concentration, loss of interest in activities and insomnia." (Tr. 493–94.) She states that he has been on medication for depression and back pain, and that because of the back pain, "[Tritz] has significant problems with depression, attention, concentration, focus, and ability to follow through on tasks." (Tr. 495.) By failing to adequately evaluate whether Dr. Baugrud's opinion is entitled to controlling weight, the ALJ's determination that Tritz's depression is non-severe is not supported by substantial evidence. The court will therefore remand this issue to the ALJ.

**E. Electronic Signatures**

Tritz argues that the RFC Assessments completed by State agency doctors should be rejected as unauthenticated and unreliable because each contains only an electronic signature. (Pl.'s Br. 7.) The court disagrees.

In 2007, when Drs. Callear, Foster, Bauer, and Mandli issued their RFC Assessments, they signed the report with an electronic signature. During this time, the Programs Operations Manual System ("POMS") DI 26510.089 (2003) of the Commissioner's administrative rules required an actual signature. Specifically, POMS DI 26510.089 § B.4 (2003) states:

> To meet these signature requirements, the medical evaluation documentation must

17

have an actual, physical signature of the reviewing MC/PC.[3] The typed name of an MC/PC on an electronic message or worksheet is not considered a true signature.

However, on June 8, 2009, an amendment to POMS DI 26510.089 § A.4 (as amended) allows MCs and PCs to electronically sign forms. Thus, on August 13, 2009, when the ALJ issued his decision, electronic signatures were acceptable to authenticate a document. Further, the POMS is an internal manual used by the Social Security Administration and is not binding. *Jacobs v. Astrue*, 2008 WL 4601767, at *7–9 (W.D. Wis. June 20, 2008). *See also Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989) ("The POMS manual has no legal force and therefore the standard cannot be controlling in this case.").

Because the POMS was amended prior to the ALJ's decision and because the POMS is not binding, I find that the ALJ did not err by failing to exclude the RFC Assessments as unauthenticated and unreliable documents.

## VI. CONCLUSION

The court will therefore reverse the Commissioner's decision to deny benefits and remand the case to allow the Commissioner to remedy the deficiencies discussed above.

**NOW THEREFORE IT IS ORDERED** that the decision of the Commissioner be and hereby is **REVERSED** and this action is **REMANDED** for further proceedings consistent with this decision;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

---

[3] MC refers to a medical consultant. PC refers to a psychological consultant.

**SO ORDERED** this 24th day of August 2011, at Milwaukee, Wisconsin.

**BY THE COURT:**

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
